
CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 2 1 2012

JULIA C. DUDLEY, CLERK
BY:
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SHANNON LAMAR MARTIN, )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>HAROLD W. CLARKE, )<br>)<br>Respondent. )<br>) | Case No. 7:11-cv-231<br><br>**MEMORANDUM OPINION**<br><br>By: James C. Turk<br>Senior United States District Judge |

Petitioner Shannon Lamar Martin filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. The Court ordered service of the Petition upon the named Respondent on June 2, 2011. On June 28, 2011, the Respondent filed a Motion to Dismiss (ECF No. 4). On December 15, 2011, the Petitioner responded (ECF No. 11). The matter is now ripe for decision. For the reasons stated below, Respondent's Motion to Dismiss (ECF No. 4) is **GRANTED** and the Petition for Habeas Corpus (ECF No. 1) is **DENIED**.

## I. Factual and Procedural Background

The Petitioner was convicted at trial. Viewed in the light most favorable to the Commonwealth, the evidence presented at trial was as follows.[1] During the afternoon of May 23, 2006, Martin and two other men showed up at Stephanie Logan ("Logan")'s apartment and asked to see her son. Logan, who knew Martin, recognized him and exchanged pleasantries.

---

[1] This recitation of the facts is adapted from the through summary prepared by the Virginia Court of Appeals in Martin's direct appeal. See Martin v. Virginia, No. 1002-07-3 (Va. Ct. App. Dec. 28, 2007) (per curiam).

1

She told the group of men that her son was busy, but as they walked away, Logan's son, Shaunte Logan ("Shaunte"), appeared in the doorway and argued with the men.

Shortly before 5:00 the next morning, Martin and two other men kicked in the door to Logan's apartment and entered the doorway. Logan, her boyfriend Jermaine Jones ("Jones"), and Logan's two children had been sleeping inside. The commotion awoke the apartment's occupants, and they came to the door. Martin, displaying a handgun, told them to "get down on the ground." In response to this order, Logan, Jones, and Shaunte charged at the three intruders, pushed them out the door and pressed against the door in an effort to keep the intruders out. The door, however, would not stay shut because of the damage it sustained during the initial break-in. Martin managed to force his arm through the doorway. Pointing his gun in Logan's face, he told her, "Bitch, move, or I'm going to shoot you in your mother fucking face." As Martin fired the gun in Logan's direction, Jones tilted Martin's arm upward towards the ceiling, causing the resultant bullet to hit the ceiling. Martin and his accomplices then fled, firing more shots as they ran.

Lily Giles ("Giles"), one of Logan's neighbors, saw Martin and two others exit a black car parked outside her home between 4:30 and 5:00 a.m. on May 24, 2006. Giles, who knew Martin casually, saw him walking in the general direction of Logan's apartment. Giles then heard a commotion, accompanied by "four or five gunshots." She then heard a man yell, "Come on, Shannon. Come on, Shannon."

After the intruders left, Logan contacted the police. Investigator Reggie Gravely of the Martinsville Police Department ("Investigator Gravely") responded, whereupon he noticed that the molding on Logan's door was partially off and saw some pieces of molding in the yard.

2

Gravely discovered one cartridge casing on the deck and one in the street. He also saw a bullet hole in the ceiling, about 18 to 24 inches from the doorway. Logan told Gravely that she knew one of the intruders as "Shannon" and that he had been by her apartment the previous day. A few hours later, Logan picked Martin out of a photo line-up as the armed individual who had appeared at her home that morning. Logan confirmed this identification at trial, pointing Martin out as the man who shot at her.

Arrested and brought to trial in the Circuit Court for the City of Martinsville, Martin was convicted of five crimes: (1) Felon in Possession of a Firearm in violation of Va. Code § 18.2-308.2, for which he was sentenced to two years incarceration; (2) Maliciously Shooting into an Occupied Building in violation of Va. Code § 18.2-279, for which he was sentenced to ten years with nine years suspended; (3) Use of a Firearm in a Felony in violation of Va. Code § 18.2-53.1, for which he was sentenced to three years; (4) Statutory Burglary in violation of Va. Code § 18.2-89, for which he was sentenced to twenty years, with ten years suspended; and (5) Attempted Murder in violation of Va. Code § 18.2-26, for which he was sentenced to ten years, with five years suspended. In total, Martin received an active sentence of 21 years. He timely noted an appeal, which was denied by the Virginia Court of Appeals. Martin v. Virginia, No. 1002-07-3 (Va. Ct. App. Dec. 28, 2007). Martin appealed that denial to the Supreme Court of Virginia, which refused to hear the appeal. Martin v. Virginia, No. 082328 (Va. May 8, 2009).

On March 10, 2010, Martin, proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus in the Circuit Court for the City of Martinsville. The Circuit Court granted the respondent's motion to dismiss and denied Martin's petition. Martin v. Johnson, No. CL10-49 (Va. Cir. Ct. May 5, 2010) ("Va Habeas Op."). Martin timely noted an appeal to the Supreme Court of Virginia. In a summary order, the Virginia Supreme Court refused Martin's habeas

3

appeal.[2] Martin v. Johnson, No. 101586 (Va. Dec. 15, 2010). On May 16, 2011, Martin, now represented by counsel, filed the instant action, seeking federal habeas review pursuant to 28 U.S.C. § 2254.

## II. Standard of Review

Federal courts grant habeas relief "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Procedurally, however, the Supreme Court has established that a federal court may not grant habeas relief for unexhausted state claims not presented to the highest state court. O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). All of the claims Martin makes were previously raised in his state habeas petition, and thus are considered to be exhausted and susceptible to federal habeas review.

Pursuant to the reforms of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal habeas court may not grant habeas relief for any claim "that was adjudicated on the merits in State court proceedings," unless the adjudication "resulted in a decision that was [1] contrary to, or [2] involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). For the purposes of 28 U.S.C. § 2254(d)(1), an adjudication on the merits applies to all claims that were reached and decided in state court, even if in summary fashion.

A state court decision is "contrary to" the Supreme Court's clearly established precedent if (1) the state court "arrives at a conclusion opposite to that reached by the Supreme Court as a

---

[2] For the purposes of federal habeas review, where the highest court of a state summarily upholds a lower court's denial, the Court will "look through" to the last reasoned opinion in the state collateral proceeding. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). Here, the last reasoned opinion came from the Circuit Court of the City of Martinsville in Martin v. Johnson, No. CL10-49 (Va. Cir. Ct. May 5, 2010).

4

matter of law" or (2) the state court "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that reached by the Supreme Court. Williams v. Taylor, 529 U.S. 362, 405 (2000). By contrast, a state court decision constitutes an "unreasonable application" of clearly established federal law if the state court (1) identifies the correct legal rule but unreasonably applies it to the facts of the particular case; (2) unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply; or (3) "unreasonably refuses to extend that principle to a new context where it *should* apply." Id. at 407 (emphasis added).

Here, all of Martin's claims center on ineffective assistance of counsel. With ineffective assistance claims, where, as here, there is no other Supreme Court precedent on point, the Court must look to the familiar "cause and prejudice" test delineated in Strickland v. Washington, 466 U.S. 668 (1984). *See* Knowles v. Mirzayance, 556 U.S. 111, 122–23 (2009) ("Indeed, this Court has repeatedly applied [Strickland] to evaluate ineffective-assistance-of-counsel claims where there is no other Supreme Court precedent directly on point"). Under Strickland, a successful claim for ineffective assistance of counsel must establish (1) that counsel's performance fell below an objective standard of reasonableness, such that counsel was not acting as the counsel guaranteed by the Sixth Amendment; and (2) that but for counsel's objectively unreasonable performance, there is a reasonable probability the outcome of the trial would have been different. Strickland, 466 U.S. at 687–91. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Under this standard, "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 131 S.Ct. 770, 791 (2011). If a reviewing court determines that the petitioner's claim fails on either the "cause"

5

or the "prejudice" prong of the Strickland test, the court's inquiry may stop there. Strickland, 466 U.S. at 697.

Here, it is undisputed that the state court applied the correct legal standard—Strickland. Thus, in order to gain relief, Martin must demonstrate here that the state court denial of his claims was an unreasonable application of the Strickland standard. Uniquely, in the ineffective assistance context, this Court's review is "doubly deferential." AEDPA itself demands substantial deference to the state courts. Thus, as an initial matter, the Court's inquiry is not simply whether the state court's determination was incorrect, but whether it was objectively unreasonable. *See* Schriro v. Landrigan, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold"). Indeed, the Court may not disturb the sound judgment of the state court and find "an unreasonable application of federal law unless the state court's decision lies well outside the boundaries of permissible boundaries of opinion." Tice v. Johnson, 647 F.3d 87, 108 (4th Cir. 2011) (internal quotation marks omitted). Second, because the Strickland standard is so general, the Court is required to give an added layer of deference to the reasonableness of a state court's interpretation of Supreme Court precedent. Knowles, 556 U.S. at 123. With these principles in mind, the Court now turns to each of Martin's claims.

### III. Discussion

#### A. Claim A

Martin's first claim alleges that his counsel rendered constitutionally ineffective assistance when counsel failed to renew his motion to strike after presenting the defense's case.

6

In Virginia, a criminal defendant may move to strike the evidence if he feels the evidence is insufficient as a matter of law to sustain a conviction. Va. Ct. R. 3A:15. Such a motion may be made either after the Commonwealth has rested its case or at the conclusion of all the evidence. *Id.* Even if a defendant moves to strike at the conclusion of the Commonwealth's case, his refusal to renew that motion at the conclusion of all the evidences constitutes a waiver of the issue on appeal. Murillo-Rodriguez v. Virginia, 688 S.E.2d 199, 208 (Va. 2010); McQuinn v. Virginia, 460 S.E.2d 624, 626 (Va. Ct. App. 1995); White v. Virginia, 348 S.E.2d 866, 867 (Va. Ct. App. 1986).

Here, Martin argues that counsel's assistance was constitutionally ineffective because although counsel moved to strike the Commonwealth's evidence at the end of the Commonwealth's case, he neglected to do so at the close of the evidence, thus failing to preserve the issue for appeal. On collateral review, the Martinsville Circuit Court denied this claim, reasoning that counsel's reasonable belief that his closing argument preserved the sufficiency issue for appeal coupled with the fact that on direct appeal, while holding that the issue was waived, the Virginia Court of Appeals decided the matter on the merits, showed that Martin failed to meet Strickland's prejudice prong. Va. Habeas Op. 2–3.

Petitioner, represented by his trial counsel, raised the sufficiency issue on direct appeal. The Virginia Court of Appeals determined that counsel's failure to renew his sufficiency objection at the close of the evidence constituted waiver. Nonetheless, the court proceeded to decide the question on the merits, engaging in a lengthy recitation of the facts. It found that "[t]he testimony of Logan and Giles was not inherently incredible or shown to be demonstrably false," and concluded that the evidence at trial was sufficient to support Martin's convictions. Martin, No. 1002-07-3, slip. op. at 5. Petitioner claims that this Court should not be bound by

7

the Court of Appeals' merits determination because it is "mere dicta" and further argues that even though the Virginia Supreme Court denied review of the Court of Appeals' decision, it simply affirmed the procedural denial and did not have the opportunity to consider the merits of the sufficiency challenge. Accordingly, Martin reasons, this Court should not give any weight to the Virginia Court of Appeals decision for the purposes of determining Strickland prejudice. The Court need not address that question here because it has conducted its own review of the evidence and reaches the same conclusion on the merits of Martin's sufficiency objection.

The evidence presented at trial was more than sufficient to sustain the Petitioner's convictions. Logan, the Commonwealth's chief witness, testified as follows. At approximately 5:00 A.M. on May 24, 2006, Martin, along with two others, came to her home and broke in the door. Tr. 21–22. Martin, armed with a gun, told her to get down on the ground. Id. at 22. In an effort to protect her children, she ran up to Martin and attempted to push him and his compatriots out of the apartment. She was assisted by her boyfriend and her son. At some point during the altercation, Martin stuck his gun in Logan's face and said, "Bitch, move out of the way. Let me in or I'm going [to shoot you] in your mother fucking face." Id. at 27. Martin, with the gun still in Logan's face, then shot into the apartment. As the shot was fired, Logan's boyfriend, Jones, tiled Martin's arm upward and caused the shot to hit the ceiling. Id. at 28. Logan's testimony was corroborated by Giles, a neighbor who testified that she saw Martin proceed up the street in the direction of Logan's apartment between 4:30 and 5:00 on the morning of May 24, 2006. Id. at 69–70. She then heard a commotion and four or five gunshots. Id. at 70. Soon afterwards, she heard a man's voice saying "Come on, Shannon. Come on, Shannon" immediately before a strange car left her street. Id. at 84. The Commonwealth also presented the testimony of two investigators from the Martinsville City Police Department, Investigator Gravely and

8

Investigator Donnie Shumate. Investigator Gravely testified that when he arrived at Ms. Logan's apartment, he observed the front door molding to be partially destroyed, as well as a bullet hole in the ceiling approximately 18 to 24 inches from the doorway. *Id.* at 87. Investigator Shumate testified that he prepared a photographic line-up that was later shown to Logan, from which she correctly identified Martin. *Id.* at 104. Importantly, Shumate testified that he prepared only one photo line-up, and none of the men in the line-up he prepared, aside from Martin, were named "Shannon." *Id.* at 106.

Martin then presented his case, first recalling Investigator Gravely to the stand. Gravely testified that he showed two different line-ups to Ms. Logan, with different photographs in each. Logan did not recognize anyone from the first line-up ("Line-up Number 1") but made a positive identification of Martin in the second line-up ("Line-up Number 2"). Jones was shown the same two line-ups and was unable to make a positive identification from either. Shaunte was only shown Line-up Number 2, and he was able to pick Martin out of the line-up. Martin's counsel then called Victoria Gravely ("Victoria"), Martin's girlfriend, and her father, John Gravely. Both testified that they had seen Martin at Victoria's home on the morning of May 24, 2006 at approximately 5:00 A.M. This was the basis of Martin's defense at trial—he was at home with his girlfriend, and Logan had misidentified her attacker.

The trial judge found the Commonwealth's witnesses, specifically Giles and Stephanie Logan, to be "highly credible." *Id.* at 151. In Virginia, an appellate court may not set aside a trial court's judgment for want of evidence "unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Va. Code § 8.01-680. In an appeal from a denial of a motion to strike for lack of evidence, the Virginia appellate courts will not reweigh the evidence. Nusbaum v. Berlin, 641 S.E.2d 494, 507 (Va. 2007) (citing Sch. Bd. of

9

Campbell Cnty. v. Beasley, 380 S.E.2d 884, 888 (Va. 1989)). The question on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond the essential elements of the crime[s] beyond a reasonable doubt." Kelly v. Virginia, 584 S.E.2d 444, 447 (Va. App. 2003) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). In a bench trial, it is the exclusive province of the trial judge "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*

The Court's inquiry on Claim A, assessing Strickland prejudice through the doubly deferential lens of federal collateral review of a state court judgment, is a convoluted one. It is as follows: whether the Virginia habeas court unreasonably applied Supreme Court precedent in finding no reasonable probability that preserving the sufficiency of the evidence argument for appeal would have resulted in a different outcome. Here, Martin's only defense was an alibi: he was not at Logan's home, and it was someone else who broke down the door and shot at her. It is clear that a rational trier of fact, believing the Commonwealth's witnesses and disbelieving Martin's witnesses, had enough evidence to find him guilty beyond a reasonable doubt. Having so found, it follows that the Virginia habeas court's application of Strickland prejudice was not an unreasonable one. Accordingly, Claim A is **DENIED**.

### B. Claim B

Martin's second claim argues that he received constitutionally ineffective assistance of counsel when counsel failed to investigate, discover, or present evidence that could have discredited Logan's testimony. "Counsel must ordinarily investigate possible methods for impeaching prosecution witnesses, and in some instances failure to do so may suffice to prove a

claim under Strickland." Huffington v. Nuth, 140 F.3d 572, 580 (4th Cir.1998). Specifically, Martin argues that the statement "Bitch, move or I'm going to shoot you in your Mother Fucking face," attributed to him by Logan, was an essential part of the Commonwealth's case and constituted "the only evidence that would support the elements of intent and premeditation for the charge of attempted murder." Pet. at 15. Martin now contends that his trial counsel should have used Logan and Jones' statements to the police, in which they made no mention of such a statement, to impeach Logan's testimony as to this point. This claim must also fail on Strickland's prejudice prong.

In Virginia, attempted murder is a specific intent crime: "[W]hile a person may be guilty of murder though there was no actual intent to kill, he cannot be guilty of an attempt to commit murder unless he has a specific intent to kill." Merritt v. Virginia, 180 S.E. 395, 398 (Va. 1935). In any prosecution for attempt, the Commonwealth must prove two things: (1) an intent to commit a crime; and (2) that the defendant committed an overt act in furtherance of that crime. Sizemore v. Virginia, 243 S.E.2d 212, 213 (Va. 1978). The overt act here cannot seriously be disputed: Logan's testimony established that Martin shot into her apartment. The question on the Strickland performance prong is whether, even assuming Martin's counsel adequately discredited Logan's testimony as to the specific statement about shooting her in the face, whether there was a reasonable probability that the outcome would have been different.

"Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case." Sandoval v. Virginia, 455 S.E.2d 730, 732 (Va. App. 1995). Even without the specific statement that he was going to shoot Logan, there was plenty of evidence for the trial court to find that Martin harbored the requisite intent for attempted murder. Here, viewed in the light most favorable to the Commonwealth, the

11

evidence showed that Martin and two associates broke down Logan's front door. Martin, armed with a deadly weapon, instructed the occupants to get down on the floor. Martin then wedged the gun into the doorway, pointed it in Logan's face, and fired a shot in Logan's direction. "The fact finder may infer that a person intends the immediate, direct, and necessary consequences of his voluntary acts." Rivers v. Virginia, 464 S.E.2d 549, 551 (Va. App. 1995) (quoting Bell v. Virginia, 299 S.E.2d 450, 452 (Va. App. 1991)) (internal quotation marks omitted). Martin's statement threatening to shoot Logan may well have been damaging evidence, but contrary to Martin's suggestion, it was far from the only thing that supported the *mens rea* for attempted murder. Accordingly, the Court finds that even if competent counsel would have cross-examined Logan on as to the specific threat to shoot her in the face, there is not a reasonable probability that the outcome would have been different. Claim B is **DENIED**.

### C. Claim C

Martin next argues that his trial counsel was constitutionally ineffective because he failed to investigate, discover, and/or present evidence that could have shown the shot fired into Logan's home was an accidental discharge. The state habeas court rejected the claim, reasoning in part that Martin's failure to provide an affidavit was "fatal to his claim." Va. Habeas Op. 5. In the context of allegations of inadequate investigation, a habeas petitioner bears a burden of providing a proffer to raise his claim beyond the speculative level. Basette v. Thompson, 915 F.2d 932, 940–41 (4th Cir. 1990). On habeas, Martin claims that "[trial] [c]ounsel's failure to investigate the forensics eliminated a reasonable defense for the Petitioner and should be determined ineffective." Pet. at 17. But Martin fails to tell the Court what an expert would have said if called. Rather, he simply speculates about what might have possibility been revealed if counsel had retained and called an expert. This is insufficient. "[A]n allegation of inadequate

12

investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced." Beaver v. Thompson, 93 F.3d 1186, 1195 (4th Cir. 1996). Martin's trial counsel claims that he discussed the issue of whether to hire an expert to explore the possibility that the gun went off accidentally. He further claims he discussed the matter with Martin before trial, Martin indicated he did not have the money to hire an expert, and counsel did not expect the court to authorize public funds to hire an expert on such a speculative claim. Ex. A to Va. Habeas Op. ¶ 4. Counsel also apparently believed that "the common sense of the judge would prevail if he believed that a blow to the hand took place and caused the discharge." Id. Of course, in evaluating trial counsel's performance, this Court cannot put much stock in his subjective beliefs, much less self-serving statements made after the fact. But even putting counsel's claims aside, "counsel is not ineffective merely because he overlooks one strategy while vigilantly pursuing another." Williams v. Kelly, 816 F.2d 939, 950 (4th Cir. 1987). Here, Martin pressed an alibi defense. Counsel cross-examined Logan at length, asking her about the clothing of the individuals who came to her house, and whether she might have mixed up Martin with another man ("Derrick" or "Tec"). Additionally, it is clear that counsel was aware of Logan's statement to the police and used in trying to discredit her. Counsel did in fact point out that her detailed statements to the police identifying her assailants were inconsistent with part of her testimony, where she indicated that all she saw was the gun. He also established that Giles did not actually see Martin enter Logan's house, and that she only saw him 15 to 20 feet away from the apartment. Tr. 79. Giles also did not see Martin retreat from Logan's residence, and simply heard a general commotion coming from the direction of Giles's apartment. Additionally, counsel put on two witnesses in an attempt to establish that Martin was elsewhere at the time of the shooting.

13

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Wiggins v. Smith, 539 U.S. 510, 521–22 (2003) (quoting Strickland, 466 U.S. at 690–91) *Accord* Bunch v. Thompson, 949 F.2d 1354, 1364 (4th Cir. 1991) ("The best course for a federal habeas court is to credit plausible strategic judgments in the trial of a state case."). Counsel's strategic choices here are a far cry from the rigorous standards required to deem them constitutionally ineffective.

Martin relies on Draughon v. Dretke, 427 F.3d 286 (5th Cir. 2005). In Draughon, the Fifth Circuit upheld a district court's grant of habeas relief where the petitioner was able to show that his claim met both the Strickland prongs where counsel failed to obtain a forensic examination of the fatal bullet, and where that forensic evidence could have directly refuted the testimony of the state's star witness that the defendant did not shoot the victim at point blank range. Draughon, however, is readily distinguishable from the instant case. Draughon, in his state habeas bid, had brought forth affidavits from the chief and deputy medical examiners of the county where the crimes occurred in which they both claimed that the limited evidence available raised the possibility that the shot that killed the victim was a ricochet. Here, as noted above, Martin has brought forth no such affidavits. The present case is more akin to Huffington v. Nuth. 140 F.3d 572 (4th Cir. 1998). In Huffington, the petitioner claimed that his counsel's failure to cross-examine the prosecution's bullet composition expert, or to have those results confirmed by an independent expert, rendered counsel's assistance ineffective. *Id.* at 582. The petitioner's argument at trial was that he was not at the scene, and trial counsel testified that he

14

chose not to attack the forensic evidence because such an attack would not have been consistent with an alibi defense. *Id.* The U.S. Court of Appeals for the Fourth Circuit found that "[t]his tactical decision . . . [did] not fall outside the wide range of reasonable discretion afforded to counsel." *Id.*

Ultimately, taking into account all the circumstances, the Court cannot find that counsel's performance in failing to hire a ballistics expert to explore the possibility of Martin's shot being an accidental discharge "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." Strickland, 466 U.S. at 688. Accordingly, the Virginia habeas court did not unreasonably apply federal law as established by the Supreme Court of the United States, and the petition is **DENIED** as to Claim C.

### D. Claim D

Martin's fourth claim argues that his trial counsel was constitutionally ineffective when counsel elicited damaging testimony from a witness. Specifically, Martin claims that his counsel elicited testimony from Investigator Gravely as to the fact that Logan's son Shaunte identified Martin out of a photo array. Martin further claims that this evidence was used by the Commonwealth in its closing argument, and that if counsel had not elicited such damaging testimony, there is a reasonable probability the outcome of the trial would have been different. The Court disagrees. This claim also fails on both Strickland prongs. The pertinent part of the trial transcript is as follows:

> Q. [by Defense Counsel]   What about [Photo Line-up] Number2 [sic]?
> A. [by Investigator Gravely]   It was shown to Jermaine Jones simultaneously at 8:55 A.M. No positive ID made.
> Q.   What about Shaunte Logan? Did he get a chance to see Photographic Line-up 1 and 2, sir?

15

Case 7:11-cv-00231-JCT-RSB   Document 12   Filed 03/21/12   Page 15 of 20   Pageid#: 175

> A. Yes sir. Photo Line-up 1 was shown to Shaunte at 9:05. No sir, I retract that statement. I have a notation here that Shaunte advised he only saw one suspect. I only showed him Photo Line-up Number 2.
> Q. What were the results?
> A. He made a positive ID of Photo Number 3.
> Q. Did that aid you in developing Mr. Martin as a suspect?
> A. Yes sir.

Tr. 111–12. In closing, the Assistant Commonwealth's Attorney made reference to this exchange: "She [Logan] positively ID'd the defendant as did, through testimony elicited by opposing counsel, Shaunte Logan." *Id.* at 137. Trial counsel claims that he called Investigator Gravely in order to demonstrate that some witnesses who were shown photo line-ups were unable to identify Martin as the perpetrator and question the Commonwealth's motives for calling only Logan at trial, and not her husband or boyfriend, who were also present the night of the incident and who, presumably, would have been valuable witnesses. Ex. A to Va. Habeas Op. ¶ 6. This is bolstered by counsel's summation on Martin's behalf, which called into question the Commonwealth's decision not to call Jones and Shaunte. *See* Tr. 144–45.

A long-standing maxim among trial practitioners is that one should always know the answer to any question one asks. The Court suspects that counsel's question might not have elicited the desired response. Nonetheless, the situation described above, even if a misstep, does not convince the Court that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Additionally, the Court finds that even if this constitutionally ineffective performance, Martin has failed to make an adequate showing of prejudice. There was substantial other evidence pointing to Martin as the perpetrator, including the testimony of Logan, which was corroborated by Giles and the physical evidence. The Court cannot conclude that the Virginia habeas court's adjudication of Claim D was an unreasonable

application of clearly established federal law. For that reason, the petition is **DENIED** as to Claim D.

### E. Claim E

In Claim E, Martin argues that counsel was constitutionally ineffective because of his failure to call Jermaine Jones as a witness. As described above, Jones was Logan's boyfriend and present at the time of the incident. Investigator Gravely testified that Jones was unable to make a positive identification from the photo line-ups. Tr. 111. Besides Investigator Gravely's trial testimony, the only evidence Martin provides in support of this claim is Jones's statement to the police. Martin argues that Jones's statement had "no mention of the gunman saying he was going to shoot anyone." Pet. ¶ 57. Additionally, he argues that Jones's description of the gunman as having a red bandana over his face contradicts Logan's positive identification of Martin as the shooter. But "when evaluating prejudice a court may consider all aspects of the evidence proffered by the petitioner, including aspects both beneficial and detrimental to petitioner's case." Huffington, 140 F.3d at 578 (internal quotation marks and citations omitted). Jones's statement to the police says only that the shooter had a red bandana wrapped around his face; he does not indicate that the bandana covered the shooter's face. Moreover, Martin is correct that Jones's statement does not specifically say that the gunman threatened to shoot anyone. But it does not *contradict* any of Logan's testimony. Moreover, the statement does corroborate Logan's other parts of Logan's recollection: "The guy with the red bandana stuck his arm through the door with a gun in it, he was say [sic] open the door, bitch get away from the door. Thats [sic] was when the first shot was fired into the ceiling . . . ." Jones Stmt., attached as Ex. to Pet. It is true that Jones's testimony may have corroborated Martin's theory that he was a victim of mistaken identity. But this is purely speculative. Moreover, even if counsel did get

17

Jones to admit that he was unable to identify Martin from a photo array, calling Jones to the stand would likely have hurt Martin more than it helped. As counsel well recognized, it Jones's testimony, assuming it was not disallowed as cumulative, would have likely served to reinforce the details of the incident and might have further undermined Martin's alibi.[3] Counsel's decision not to call Jones to the stand was eminently reasonable. Martin has failed to satisfy Strickland's performance prong as to Claim E, and the petition is thereby denied as to this claim.

### F. Claim F

Martin's final claim argues that the Court should grant him relief because of the cumulative effect of his ineffective assistance claims A through E. But the Court has rejected each of Martin's individual claims. Having done so, "it would be odd, to say the least, to conclude that those same actions, when considered collectively, deprived [the Petitioner] of a fair trial." Fisher v. Angelone, 163 F.3d 835, 852 (4th Cir. 1998). *See also* Arnold v. Evett, 113 F.3d 1352, 1364 (4th Cir. 1997) (summarily dismissing cumulative error argument based on court's findings as to individual claims of error). The appropriate inquiry with regard to Claim F is whether the cumulative effect of the errors alleged in Martin's individual claims rises to a level of prejudice creating a reasonable probability that they affected the outcome of the proceeding. This is a nearly insurmountable threshold, and Martin has not crossed it here. The Court finds the cumulative error claim fails on Strickland's prejudice prong. Accordingly, the state court's decision on this Claim was not an unreasonable application of clearly established federal law as

---

[3] In his statement to the police, Jones said: "The other two suspects apparently fled on foot. Because I only saw the one guy with the red bandana. I saw him run in the driveway at the house on the corner of Bruce and Swanson." If Jones had been on the stand, he likely would have testified to this, as well as the rest of his statement, which described the violent assault on his home, his significant other, and the children.

determined by the Supreme Court of the United States, and the Petition is **DENIED** as to Claim F.

### G. Evidentiary Hearing

Martin asks the Court to hold an evidentiary hearing before ruling on the merits of his claims. "Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." Cullen v. Pinholster, 131 S.Ct. 1388, 1401 (2011). Where, as here, a federal habeas petitioner has failed to develop the factual basis of his claims in state court, the Court cannot conduct an evidentiary hearing unless the petitioner shows that his claims rely on (1) a new, retroactive rule of constitutional law that was previously unavailable; or (2) a factual predicate that could not have been previously discovered through the exercise of due diligence, and that the facts underlying the claims would be sufficient to show by clear and convincing evidence that no reasonable finder of fact could have convicted the petitioner of the underlying offenses. 28 U.S.C. § 2254(e). The Court finds no reason to hold an evidentiary hearing in this case, and the request for such a hearing is denied.

### H. Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts requires that the Court issue or deny a certificate of appealability when it enters a final order "adverse to" a federal habeas petitioner. A certificate of appealability will not issue unless the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In order to do so, the petitioner must show that reasonable jurists could disagree about the petition's merits or that "the issues presented [are] adequate to deserve encouragement

19

to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)) (internal quotation marks omitted). Having considered the record and the relevant legal standards, the Court finds that Martin has not made the requisite substantial showing, and a certificate of appealability is therefore **DENIED**.

IV. **Conclusion**

For the reasons discussed above, the Petition is **DENIED** in its entirety and the Respondent's Motion to Dismiss is **GRANTED**. An appropriate order will issue this day.

**ENTER**: This 21st day of March, 2012.

_____
Senior United States District Judge